**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1188

CITY OF SOUTHFIELD GENERAL EMPLOYEES' RETIREMENT SYSTEM,

Plaintiff – Appellant,

and

MIGUEL SUAREZ; ROBERT BASEL; HANY MAGOUR; BRIAN M. WATSON,

Plaintiffs,

v.

ADVANCE AUTO PARTS, INC.; THOMAS R. GRECO; JEFFREY W. SHEPHERD; WILLIAM J. PELLICCIOTTI, JR.,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever, III, District Judge.  (5:23−cv−00563−D−BM)

Argued:  December 10, 2025                    Decided: February 17, 2026

Before DIAZ, Chief Judge, GREGORY, Circuit Judge, and Gina M. GROH, United States District Judge for the Northern District of West Virginia, sitting by designation.

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Gregory and Judge Groh joined.

**ARGUED:** Dana Lydia Kaersvang, DEUTSCH HUNT PLLC, Washington, D.C., for Appellant. William Michael Regan, Allison Michele Wuertz, HOGAN LOVELLS US LLP, New York, New York, for Appellees. **ON BRIEF:** Christopher M. Wood, Nashville, Tennessee, Ashley M. Price, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Robert N. Hunter, Jr., HIGGINS BENJAMIN, PLLC, Greensboro, North Carolina; Hyland Hunt, Ruthanne M. Deutsch, DEUTSCH HUNT PLLC, Washington, D.C., for Appellant. Jacey Lara Gottlieb, Christine Jha, HOGAN LOVELLS US LLP, New York, New York; Clifton L. Brinson, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP, Raleigh, North Carolina, for Appellees.

---

DIAZ, Chief Judge:

Advance Auto Parts, Inc., is a public company that sells automobile parts and accessories. In early 2023, it announced aggressive financial goals that exceeded investors' expectations, which increased the company's stock price. But throughout the year, Advance Auto significantly reduced those estimates and corrected a series of accounting errors. Its stock price plummeted after the disclosures.

The City of Southfield General Employees' Retirement System filed suit, contending that Advance Auto and several former officers committed securities fraud by manipulating the company's accounting. The district court dismissed the complaint for failing to establish scienter, or wrongful intent.

We agree that Southfield's allegations don't satisfy our scienter standards. So we affirm.

I.

We review de novo a dismissal under Federal Rule of Civil Procedure 12(b)(6). *Employees' Ret. Sys. v. MacroGenics, Inc.*, 61 F.4th 369, 381 (4th Cir. 2023). We accept the plaintiff's factual allegations as true and consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

A.

In early 2021, Thomas Greco, Advance Auto's then President and Chief Executive Officer, publicly announced a three-year plan to increase the company's sales and profit margins. Over the next two years, Greco and Jeffrey Shepherd (Advance Auto's then

3

Executive Vice President and Chief Financial Officer) assured investors that the company was on track to achieve its goals.

For example, Advance Auto touted increased profit margins in the third quarter of 2022. And when the company reported its fourth-quarter performance that year, Greco told investors that Advance Auto had "positive momentum." Joint Appendix ("J.A.") 26. Still, he acknowledged that 2022 had been a "challenging year" and that the "overall results did not meet expectations." J.A. 258. He promised that the company would "tak[e] decisive actions to improve performance in 2023." J.A. 26.

In the same report, Advance Auto issued its 2023 guidance. The company estimated that it would see net sales between $11.4 billion and $11.6 billion; operating income between $889 million and $951 million; and an operating income margin between 7.8% and 8.2%.

Greco and Shepherd both publicly emphasized their focus on expanding operating margins. Greco was "confident" Advance Auto would continue to grow its margins in 2023, and analysts thought the company's forecast was "better than" expected. J.A. 32–33.

Greco also announced that he would retire at the end of 2023 because the company was "in the final year of [its] three-year strategic business plan." J.A. 26. But he assured investors that "by planning for retirement in advance," he would be able to "facilitate a smooth transition" for his successor. J.A. 26–27.

The market reacted positively to these announcements, and Advance Auto's stock price increased.

4

B.

Advance Auto held its annual shareholder meeting in May 2023. In a non-binding vote, shareholders ratified Greco's and Shepherd's fiscal year 2022 compensation. Both executives received a base salary and a bonus for meeting key financial targets.

The company allotted about $8.4 million to Greco, citing his "[s]trong multi-year performance" and the fact that his "salary had not been adjusted since joining the [c]ompany in 2016." J.A 60. It awarded Shepherd about $2.6 million, which also included a raise for "[p]erformance [that] exceeded individual objectives for 2021." J.A. 61.

C.

But the positive momentum didn't last. Within a week of the shareholder meeting, Advance Auto issued first-quarter results for 2023. Its performance was "well below expectations." J.A. 325. The company also disclosed the first of several accounting errors: it identified approximately $17 million in costs that were "incurred in prior years but not expensed in the corresponding periods." J.A. 29.

Greco and Shepherd blamed the company's "poor performance on external factors."[1]   J.A. 33.   Greco warned investors that he "expect[ed] the competitive environment . . . to remain very challenging" throughout the year. J.A. 294. So Advance Auto amended its 2023 guidance to reduce estimates for net sales, operating income, and operating margin.

---

[1] In part, they attributed the company's difficulties to an increasingly competitive market. But some analysts felt that this explanation was "out of line" with what Advance Auto's competitors were reporting at the time. J.A. 34–35.

5

At this point, the company's Chairman, Eugene Lee, took on an "expanded role as interim executive chair" to "provid[e] additional operational oversight and support to [Advance Auto's] management team." J.A. 62.

When Advance Auto announced second-quarter results, it again revised its guidance to forecast steeper declines in operating income and operating margin. On an investor call, Lee attributed the decline in margins to the company's low asset productivity and the structure of its distribution centers.

Advance Auto then announced that Greco would resign as President and Chief Executive Officer in September 2023, a few months earlier than planned. The company also reported that Shepherd had "separated from the company." J.A. 63. And William Pellicciotti, Jr., Advance Auto's Controller and Chief Accounting Officer, resigned shortly after.

### D.

Advance Auto had new managers in place when it published its 2023 third-quarter results. But the company continued to underperform, which caused it to again revise its 2023 guidance.

Advance Auto also "identified additional errors impacting cost of sales and selling, general and administrative costs." J.A. 374. It determined that these errors affected its 2022 financial results, so it issued a public restatement. But Advance Auto emphasized that it had "evaluated the errors and determined that the related impacts were not material to the previously issued consolidated financial statements for any prior period." J.A. 374.

6

When Advance Auto filed its Form 10-Q for the third quarter of 2023, it elaborated on the accounting errors. In addition to the $17 million error discovered back in May, the company identified $10.2 million in previously undisclosed costs. Advance Auto said the errors "primarily related to product returns and vendor credits." J.A. 18.[2]

By the end of 2023, Advance Auto's operating income and margins were a fraction of its initial guidance: its operating income totaled $114 million instead of the originally estimated $889-951 million, and its operating margin was 1% instead of 7.8-8.2%. And in its 2023 Form 10-K, the company corrected accounting errors in its financial statements for 2021, 2022, and the first three quarters of 2023. These errors also "primarily related to product costs and vendor credits." J.A. 89.

In total, Advance Auto had understated its expenses by about $100 million. The company promised to "devote[] significant time and resources to complete its remediation of the material weakness," including by hiring a new Chief Financial Officer and Chief Accounting Officer. J.A. 69.

---

[2] Advance Auto earns "vendor credits" when it returns a product to a vendor. Some vendors also offer "vendor incentives," which act as rebates so that the more product Advance Auto purchases, the less it pays for each individual unit.

Although Advance Auto attributes its errors to vendor credits, Southfield claims that the company "improperly account[ed] for vendor incentives." Appellant's Br. at 8. Advance Auto responds that this claim mistakenly conflates the two concepts. Southfield, though, alleges that both credits and incentives serve as "reductions to amounts owed and/or payments from vendors." J.A. 15. And at oral argument, Southfield's counsel stated that Advance Auto receives vendor incentives as credits. Given the posture of the appeal, we view the allegations in the light most favorable to Southfield and accept that vendor incentives are linked to vendor credits. *See In re Willis Towers Watson PLC Proxy Litig.*, 937 F.3d 297, 302 (4th Cir. 2019).

The corrections affected the company's financial results only slightly: from the first quarter of 2021 through the third quarter of 2023, Advance Auto's operating income decreased by 4.5%, its cost of sales increased by 0.39%, and its selling, general, and administrative expenses increased by 0.09%.

Still, Advance Auto's stock price dropped in response to each disclosure. It fell by over 50% between May 30, 2023, and November 21, 2023.

E.

After multiple investors sued Advance Auto, the district court consolidated the cases and designated Southfield as lead plaintiff. Southfield filed a class action complaint on behalf of itself and others who purchased Advance Auto's stock between November 15, 2022 (when the company announced improved margins), and November 20, 2023 (the day before the company disclosed additional accounting errors).

The complaint alleged violations of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). It claimed that the defendants (Advance Auto, Greco, Shepherd, and Pellicciotti) intentionally or recklessly misrepresented Advance Auto's financial results and forecasts. Defendants moved to dismiss the complaint for failure to state a claim.

The district court found that Southfield "plausibly allege[d] (1) a connection between defendants' alleged misrepresentation or omission and the purchase or sale of a security; (2) plaintiff's reliance upon the misrepresentation or omission; (3) plaintiff's economic loss; (4) and loss causation." *Suarez v. Advance Auto Parts, Inc.*, No. 5:23-CV-563-D, 2025 WL 283690, at *6 (E.D.N.C. Jan. 23, 2025). Thus, Southfield plausibly

8

alleged that "defendants' public statements amount to material misrepresentations or omissions." *Id.*

Even so, the district court granted defendants' motion to dismiss because Southfield hadn't "create[d] the required strong inference of scienter against any individual defendant or Advance [Auto]." *Id.* at *8. It found the more plausible inference was that "defendants acted in good faith and corrected publicly available information each quarter." *Id.* at *7.

This appeal followed.

## II.

We start—and finish—with scienter.[3]

## A.

Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 prohibit deception in connection with securities transactions. *See* 17 C.F.R. § 240.10b-5(b); 15 U.S.C. § 78j(b). This includes "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b).[4]

---

[3] Defendants also argue that their statements about the 2023 guidance are either protected forward-looking statements or otherwise not false or misleading. The district court didn't address these arguments, and since we affirm for lack of scienter, we needn't reach them.

[4] Section 20(a) of the Exchange Act "provides that 'controlling persons' can be vicariously liable" for underlying securities violations. *Karp v. First Connecticut Bancorp, Inc.*, 69 F.4th 223, 236 (4th Cir. 2023) (citing 15 U.S.C. § 78t). So for § 20(a) to apply, Southfield must first establish its § 10(b) claim. *See id.*

To state a § 10(b) claim, the plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

For scienter, the plaintiff must show that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). Recklessness can suffice if the defendant's behavior was "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff[,] to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Pub. Employees' Ret. Ass'n v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009) (citation modified).

The Private Securities Litigation Reform Act imposes a heightened pleading standard "[a]s a check against abusive litigation by private parties" in securities fraud cases. *Tellabs*, 551 U.S. at 313. A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

"Evaluating the strength of an inference is necessarily a comparative inquiry." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014). "[A]n inference of scienter can only be strong . . . when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008).

10

When weighing the inferences, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. We "must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Yates*, 744 F.3d at 885 (citation omitted).

But if the more compelling inference is that the defendants acted innocently—or even negligently—we must affirm the district court. *See Pub. Employees' Ret. Ass'n.*, 551 F.3d at 313.

## B.

Although we ultimately evaluate Southfield's allegations holistically, we begin by assessing them individually. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 608 (4th Cir. 2021).

## 1.

Southfield first argues that Greco and Shepherd were motivated to conceal the accounting errors until after shareholders approved their "large pay packages." Appellant's Br. at 28.

Allegations that a defendant "would personally benefit from a special bonus" may support scienter. *Boykin v. K12, Inc.*, 54 F.4th 175, 186 (4th Cir. 2022). Even so, "motivations to . . . increase one's own compensation are common to every company and thus add little to an inference of fraud." *Cozzarelli*, 549 F.3d at 627.

11

Here, the allegations don't show a malicious motive. Shareholders voted on Greco's and Shepherd's pay packages only about a week before Advance Auto disclosed the first round of accounting errors. But they did so in a non-binding vote to ratify compensation that Greco and Shepherd had already earned. Southfield hasn't alleged that the executives would have been paid any less if the shareholders had voted no. So we can't infer that the shareholder vote motivated Greco and Shepherd to conceal the accounting errors.

Moreover, Advance Auto's Board calculated Greco's and Shepherd's pay packages in part based on the company's performance in 2021. The Board cited Greco's "[s]trong multi-year performance, including development and execution of a new strategic plan that [led to] record results in 2021," and credited Shepherd's "[p]erformance [that] exceeded individual objectives for 2021." J.A. 60–61. So at least some of the compensation was for performance predating the start of the class period.

And while "allegations of unusual stock sales are not required" to establish motive, *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015), Greco and Shepherd lost money by holding onto their Advance Auto stock. That, too, militates against a strong inference of scienter. *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (no scienter where defendants "lost over $471 million dollars in collective stock value during the class period" (emphasis omitted)).

2.

Southfield next argues that defendants knew about the errors because their "laser-focus[]" on Advance Auto's margins meant that they were also focused on vendor-incentive accounting, which affected those margins. Appellant's Br. at 30–32.

12

But Southfield needed to allege facts showing that defendants "knew the missing information[,] . . . knew that the information was relevant[,] . . . [and] went ahead and left the information out anyway, with the intent to mislead [p]laintiffs—or at least with a reckless disregard for the risk that leaving the information out would make their [statements] misleading." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 241–42 (4th Cir. 2023).

Southfield hasn't sufficiently alleged that defendants "had reason to know that the company's financial information was inaccurate" when they published Advance Auto's financial results. *See Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188 (4th Cir. 2009). The complaint fails to allege facts about when, or how, defendants learned about the accounting errors. So the stronger inference is that defendants based the financial statements on internal data they believed was correct at the time, but which they later learned was wrong. *Cf. Zak*, 780 F.3d at 608–10 (finding scienter where plaintiffs identified contradictory documents that defendants had seen before making public misstatements).

And while defendants may have been focused on margins, Southfield hasn't connected that focus to a knowledge of vendor incentives or the company's accounting practices.

For example, Southfield doesn't allege that Greco, Shepherd, or Pellicciotti made public statements concerning vendor incentives, which might have suggested that they were reviewing that metric. And we can't assume that defendants monitored vendor incentives simply because they were senior executives. *See Syneos*, 75 F.4th at 242 ("[W]e

13

cannot impute factual knowledge to individuals merely based on their professional position.").[5]

Southfield essentially asks us to infer that because defendants were focused on margins, they were closely monitoring other metrics that could affect margins. And that we should then "*infer from that inference* that [defendants] acted with scienter." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017). But "[a] plaintiff may not stack inference upon inference to satisfy the [Reform Act's] pleading standard." *Id.* The "strong inference of scienter" must "be supported by facts, not other inferences." *Id.*

The complaint does allege that Advance Auto identified vendor incentives as a "Critical Accounting Polic[y]." J.A. 27–28. In a company statement, Advance Auto said that it "regularly review[s] the receivables from vendors to ensure they are able to meet their obligations" and that "[p]eriodic assessments of the [amounts accrued from vendors] are performed to determine the appropriateness of the estimate and are adjusted for accordingly." J.A. 28.

---

[5] One might expect Pellicciotti, as Chief Accounting Officer, to have been more focused on the accounting information. But Southfield doesn't allege that, nor does it plead what Pellicciotti knew or how he may have contributed to the errors. Without more, we can't infer scienter. *See Matrix*, 576 F.3d at 190 (explaining that a plaintiff must allege particular facts supporting that "*each* individual defendant" acted with scienter (citation modified)).

14

But this statement doesn't specify who participates in the review process or otherwise explain how the policy implicates the individual defendants. These "omissions and ambiguities count against inferring scienter." *Tellabs*, 551 U.S. at 326.

Perhaps given their professed interest in margins, defendants should have paid more attention to the company's accounting. But negligence isn't enough to sustain a § 10(b) claim. *See Pub. Employees' Ret. Ass'n*, 551 F.3d at 314 ("[T]o establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more.").

3.

Southfield also argues that the accounting errors—which totaled approximately $100 million in losses over three years—were so large that defendants must have known about them.

We may give "[i]nferential weight" to the magnitude of the errors, but "only in the context of [a defendant's] financial position." *Matrix*, 576 F.3d at 184. "As a general matter, courts should be wary when defendants focus on the size of revenues in an effort to minimize the materiality of misstatements of income or to suggest the defendant lacked motive." *Id.*

That said, it's reasonable to assume that "an individual is more likely to realize that she is missing $10 if she has $50 in her bank account than if she has $50,000 in her bank account." *Id.* So to determine whether Advance Auto must have known about the errors, we compare the resulting $100 million loss with the company's revenue.

15

Losing $100 million over three years is certainly significant in the abstract. But for a company generating about $33 billion in revenue over that same period, it's a relatively small sum. Indeed, the accounting corrections increased Advance Auto's cost of sales by only 0.39% and its selling, general, and administrative expenses by 0.09%. Viewed holistically, these facts don't support a strong inference of scienter. *See Matrix,* 576 F.3d at 184–85 (declining to give $100 million worth of errors inferential weight when the company made over $823 million per quarter); *see also Yates*, 744 F.3d at 889 ($44.9 million loss was "relatively small" compared to the company's adjusted shareholder equity of $723 million).

### 4.

Southfield next alleges that Advance Auto manipulated its accounting in the past, raising the likelihood that defendants acted with scienter here. Southfield relies on an anonymous former employee who asserts that in 2021, Advance Auto "stockpil[ed] vendor incentives, only to later release them" to boost product margins. J.A. 15.

The former employee "believed everyone in [the company's] senior management team had to be aware of the rebate release issue." J.A. 31. The employee allegedly reported their concerns to their supervisor and received an email from a Senior Vice President of Finance admitting that Advance Auto was "masking product margin through its handling of vendor incentives." J.A. 32.

"Generally, plaintiffs are free to use the allegations of confidential witnesses to support an inference of scienter." *KBC*, 19 F.4th at 609. But "such allegations will only be afforded the weight they are due given their indicia of reliability." *Id.*

16

We give little weight to this anonymous witness.  The employee left Advance Auto in 2021, well before the start of the class period.  *See Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 179 (4th Cir. 2007) (finding confidential witness unreliable given their "lack of familiarity" with the relevant conduct).  Nor is there any indication that the employee "passed their concerns on to [the individual defendants] or that the individual [d]efendants were otherwise aware of the problems alleged."  *KBC*, 19 F.4th at 609; *see also Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004) (affirming dismissal in part because plaintiffs didn't allege "that management was ever informed of" employee concerns).

Southfield alleges that the employee discussed the issue with their direct supervisor and a Senior Vice President of Finance, neither of whom is a defendant here.  The employee's mere belief that the rest of the senior management team knew about the issue is too speculative to support scienter.  *See Yates*, 744 F.3d at 887 (conclusory statements about a defendant's state of mind are insufficient); *see also KBC*, 19 F.4th at 609.

5.

Southfield next asks us to infer scienter because Greco, Shepherd, and Pellicciotti left Advance Auto within months of the first corrective disclosure.

"But executive departures are, at best, weak evidence of scienter."  *Syneos*, 75 F.4th at 244.  So Southfield needed to bolster the departures with "allegations demonstrating [d]efendants' contemporaneous knowledge" of the accounting errors for us to give this factor greater weight.  *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 754 (4th Cir. 2021).  This Southfield failed to do.

17

Advance Auto did acknowledge that hiring a new Chief Financial Officer and Chief Accounting Officer was part of its effort to remediate the accounting errors. But while this statement reinforces "the substantial accounting challenges the [c]ompany then faced, it does not compel an inference that . . .the . . . individual defendants were bent on committing fraud." *Yates*, 744 F.3d at 889. That the individual defendants may have taken the fall for failing to catch the accounting errors doesn't mean that we can infer fraudulent intent.

6.

Southfield also claims that Advance Auto's financial restatements, which corrected nearly three years' worth of financial results, are "indicative of scienter." Appellant's Br. at 38. According to Southfield, by issuing the corrections, Advance Auto acknowledged that its original statements didn't comply with Generally Accepted Accounting Principles ("GAAP").

But "[t]he mere misapplication of accounting principles," without corroborating evidence of fraudulent intent, doesn't establish scienter. *PEC Sols.*, 418 F.3d at 389 (citation omitted); *see also Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 173 (4th Cir. 2003). As we've explained, $100 million in undisclosed losses over three years isn't particularly dramatic for a company that generated about $33 billion in revenue over the same period.

Nor do the alleged GAAP violations add new material facts. Southfield argues that Greco and Shepherd "would have regularly reviewed" the original financial statements. Appellant's Br. at 38. But that still doesn't give rise to a strong inference that defendants had access to the correct accounting information and deliberately or recklessly ignored it when publishing the original statements. Without that missing link, this claim "simply

18

rides around in circles on the inadequate coattails" of Southfield's other allegations. *PEC Sols.*, 418 F.3d at 390.[6]

7.

Finally, Southfield argues that Advance Auto's first correction to the 2023 guidance is "suspicious" because it came just months after the company issued the initial rosy forecast. Appellant's Br. at 42.

"[T]emporal proximity between . . . allegedly false statements or omissions and the subsequent disclosure of the truth" is sometimes "relevant to the scienter inquiry." *KBC*, 19 F.4th at 612. A "short time between the two statements [may] suggest that the speaker must have known the truth when they uttered the falsity." *Syneos*, 75 F.4th at 244 (citation modified).

But that's only so "when the temporal proximity between false and truthful statements is very close[,] . . . otherwise, the link between an earlier misstatement and a later revelation is purely speculative." *Id.* (citation modified); *see also KBC*, 19 F.4th at 613 (declining to "draw a strong inference of scienter from the proximity of [defendant's] optimistic statements in the summer and its more sobering news in the fall").

---

[6] The district court found that the restatements were evidence of defendants' good faith efforts to correct the errors. We're not willing to go that far, since two of the three disclosures were made after Greco, Shepherd, and Pellicciotti left Advance Auto. And the other disclosure didn't alert investors to any specific problems with the company's accounting, while insisting that "the cumulative impact was not material to the current period or any previously issued financial statements." J.A. 351. Disclosures that "continue[] to represent the reliability of [the company's] financial information notwithstanding internal control problems . . . do not lend themselves to any inferences one way or the other relating to scienter." *Matrix*, 576 F.3d at 187.

19

Here, Advance Auto issued its 2023 guidance in February and revised it for the first time in May. "[T]he months-long gap between the statements is too wide to support an inference of scienter." *Syneos*, 75 F.4th at 244.

C.

Even though none of Southfield's allegations support a strong inference of scienter alone, we still need to consider whether, "evaluating the complaint holistically, the combined allegations can do what their individual parts failed to do." *KBC*, 19 F.4th at 613 (citation modified). "Allegations of scienter that would not independently create a strong inference of scienter might [complement] each other to create an inference of sufficient strength to satisfy the [Reform Act]." *Matrix*, 576 F.3d at 187–88 (citation modified).

Not so here. Southfield alleges that (1) Greco and Shepherd received large pay packages before identifying the first accounting error; (2) the two executives also publicly emphasized improving margins, which the accounting errors affected; (3) the errors totaled about $100 million; (4) an anonymous witness claimed that Advance Auto had committed prior accounting mischief; (5) the individual defendants left the company within months of the first corrective disclosure; (6) Advance Auto corrected the errors through several restatements, the bulk of which were issued after the individual defendants left the company; and (7) Advance Auto revised its 2023 guidance three months after issuing it.

Taken together, these facts may support a plausible inference of scienter. But that won't do. *See Tellabs*, 551 U.S. at 314. Even though there may be "some reason to believe [d]efendants acted with the requisite intent . . . there is not enough to create a *strong*

20

inference of scienter." *KBC*, 19 F.4th at 613.  So the district court correctly dismissed the § 10(b) claim.

And because Southfield's § 10(b) claim fails, so does its claim for vicarious liability under § 20(a).  *See Karp*, 69 F.4th at 236.

*AFFIRMED*

21